UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

_____

LARRY D.  SMITH

                Petitioner,                            Case # 07-cv-13130

                                                Hon.  Bernard Friedman

v.                                          United States District Judge

                                                 Hon.  Donald A.  Scheer

KEN ROMANOWSKI,                     United States Magistrate Judge

                Respondent.

_____

Mary A. Owens (P-33896)                 Raina Korbakis (P49467)

Attorney for Petitioner                    Assistant Attorney General

124 East Fulton Street, Suite 100          P.O. Box 30217

Grand Rapids, Michigan  49503           Lansing, Michigan  48913

(616) 742-0431                            (517) 373-4875

## PETITIONER'S REPLY TO ANSWER

### Introduction

      Petitioner submits that various of Respondent's introductory statements are misleading. Respondent says that there was an eyewitness who "watched Petitioner shoot at the fleeing Hayes." PageID.2429. Respondent also says that "another individual also identified Petitioner as the shooter.."  And also says that "Petitioner owned a distinctive pair of boots..." that purportedly matched boot prints found near the shooting.

      -Sandra Cartwright did not see any shooting.  She saw someone in the parking lot and heard gunshots.  She said that *Ursula Jackson said to her*, "Mom I looked right in his face.  It was Butter."

Ursula Jackson did not testify.  Sandra's hearsay testimony was admitted as an excited utterance. (Tr I, 42-43, PageID 404-405).  She saw someone walking in the parking lot across the street but could not identify him. (Tr I, 56 Page.ID418).   She did not see "Butter" outside her house that day. (Tr I, 66-67, PageID428-429).  Ursula Jackson denied to the police that she saw the shooter.

-Carl Voltz did not see who shot Ken Hayes.  (Tr I, 77-78, PageID.439-440).  He did see someone come from between the houses and shoot at Ken, but Voltz could not identify him.  (Tr I, 79-82, PageID.440-444).

-Ralph Cartwright did testify that Petitioner was known as "Butter" (Tr I, 91-92, PageID.453-454) and saw him walking down the street and then back up the street soon after Hayes left the house and before he (Hayes) returned.  (Tr I, 94-96, PageID.456-457).   He fell asleep and was awakened by the sound of gunshots.  (Tr I, 101, PageID.463).   Cartwright did testify that he saw "Larry" chasing Kenny Hayes with a gun. (Tr I, 102, PageID.464 ).  But then he said he did not see the face of the shooter ("Larry") but identified him only on the basis of his walk and because he saw Jay Clay's car driving down the street that morning. [1] (Tr I, 109-111, 120-121, Page.ID471-473, 482-483).  "The figure that I seen was him.  I put the description together with him.  By seeing Jay Clay in the car and the car, I put that together."  (Tr I, 110, PageID.472).  He did not see his face.  (Tr I, 110, 120-121, PageID.472, 482-483).

-Evidence technician Gene Cartwright testified that the footprint between the Annabelle houses was "distinct," meaning "pretty clear impression."  (Tr II, 31, PageID.535 ).  This is not the

---

[1]  Jay Clay had a morning paper route.

same as a "distinctive" shoe print, which implies a unique or uncommon print.  Cartwright could not

say how long the print had been there although it "seemed relatively fresh."  (Tr II, 42, PageID.546

).  The footprint was from a pair of "Honcho" boots, and a pair of Honcho boots was seized from

Petitioner's bedroom.  (Tr II, 55-56, PageID.559-560).  Of course it would not be surprising to find

a bootprint belonging to Petitioner in his own neighborhood.

Respondent's recitation of the Procedural History of this case at PageIDs 2435-2448 is

generally correct.

## Reply to Respondent

In our initial Petition (filed July 26, 2007) we contended that the limitations period began to

run on or about September 15, 2003 due to newly discovered evidence that Edward Allen had

committed perjury at trial, and that the prosecution had lied about it.  We reiterate the arguments

made in our 2007 Petition for Habeas corpus and the initial Reply to Answer filed on May 15, 2008,

Dkt. 15.  As noted in the initial filing, in September 2003, time, Petitioner received in the mail two

documents (Court of Appeals' opinions) that showed that Edward Allen had had a long relationship

as an informant with the Detroit Police and the Wayne County Prosecutor's office and had testified

in at least one trial under a grant of immunity **prior to Petitioner's trial** .  The factual bases for these

contentions formed the basis of Claims I through III of the initial Petition.

More recently, Petitioner discovered additional evidence that the prosecution concealed,

forming the basis of our new claims. This new evidence, as Respondent rightly notes, consists of

Allen's Affidavits, the 1995 prosecutor memos and other evidence showing a concerted effort on the part of Wayne County prosecutors and police (and at least one judge) to conceal the extent to which "snitch" testimony was solicited and used.  It is particularly brazen that the Respondent now would say that the new claims are untimely when these new claims are also founded on deliberate concealment by the State of Michigan and its agents of facts and procedures that the Supreme Court has condemned time and again.  Petitioner's claim of fraudulent concealment would, of course, be an "extraordinary circumstance" entitling him to equitable tolling of the statute of limitations.

Keep in mind that the newest claims are founded on the new Affidavit of Edward Allen (PageID. 2416-2423) and substantiated by the very words of Wayne County Prosecutors and one Wayne County judge:

a.      **The Agacinski and Baughman memos. PageIDs. 2410-2415.**

Robert Agacinski says,

"I have been approached by several attorneys...who have informed me of the practice of some police investigators to place prisoners on the 9th floor of 1300 Beaubien (the prisoner lock-up) in the expectation that they will over hear confessions of other suspects and testify to these jailhouse confessions in court." ***
"Third, I have been told that the snitches do lie about overhearing confessions and fabricate admissions in order to obtain police favors or obtain the deals promised."***
"Dale Collins and Bill Rice of DPD Homicide asked us to have Mr. Twilley's sentence on a murder conviction reduced.  We wouldn't.  They personally went to Judge Shamo and talked with him in chambers, and then later, Judge Shamo granted a "pro per" motion for a new sentence."

Baughman (then the **Chief Appellate Prosecutor** for Wayne County) replies:

"...[S]everal years ago at Shanty Creek federal judge Steven Trott...gave a lecture regarding use of "snitches," which included a horror story of false testimony regarding supposed inmate "confessions" to snitches "compensated for their testimony...This is a very dangerous area, ripe for false testimony...any conviction [with undisclosed consideration] **would be subject to prompt reversal."**

"...[P]risoner snitches who have been promised something (and if that promise is not disclosed to use we are looking at automatic reversal on any conviction).

The Wayne County Prosecutors Office **knew** that Allen's allegations of informant- planting was going on -- and it apparently was going on in Petitioner's case.

### b.    The Joe Twilley transcript. Page Ids. 2393-2407 .

Look at the Joe Twilley transcript.  Who was present?  A **sitting circuit court judge**, John Shamo. A police officer, Dale Collins.  **Rosemary Gordon of the prosecutor's office.  "Rosemary Gordon, Assistant Prosecuting Attorney, on behalf of the People**."   What does the judge say?

"This hearing is going on in chambers.  It's a suppressed hearing.  I don't want this transcript released to anybody."

What is a suppressed hearing if not a deliberate attempt to conceal?  What is so significant for our case is that this "suppressed hearing" occurred in July 1994 and the Agacinski and Baughman memos were written in late 1994-early 1995, all contemporaneously with Petitioner's trial.

Even more astoundingly,  Judge Shamo also appears to indicate that **Mike Cox** – later **the**

Attorney General of the State of Michigan [2] – knew about these practices as well:

> "Oh. Well, tell him [Sgt Rice] I said congratulations.  And he also informed me a
> little bit of what was going on before, about a month or so ago when we had a private
> discussion between me and the Lieutenant Rice and Sergeant collins.  And I think
> Ms. O'Connell was here at that time.  And I don't remember, but I think a prosecutor
> was here too.  ***Michael Cox I believe was here at that time."***

PageID. 2399-2400. Incidentally, Officer Dale Collins, who testified that Twilley was an informant
in at least twenty cases (Tr, 5), was involved in Petitioner's trial – he "brought the slug" (Trial Tr
III, 41, PageID.681) and was waived as a witness.


Respondent says that our new claims are untimely even if they qualify as "newly discovered
evidence" under §2244(d)(1)(D) because we should have known as early as 2003 or 2004 ("*years
before this date*", PageID.2460) that Edward Allen committed perjury and that the Detroit Police
were corrupt. Thus, our new claims XII (undisclosed leniency to Edward Allen) and XIII (fraud)
were not brought with "due diligence." PageID. 2458. Allen's letters of 2003-2004 do not explain
how Petitioner should have been put on notice that ***the Prosecutor's Office and at least one sitting
circuit court judge*** were colluding with the Detroit Police in corrupt practices.  Nor does it explain
how we were supposed to discover the factual bases for these new claims, given that there was
apparently a concerted effort by the Prosecutor's Office and the judiciary to conceal these practices.
Respondent says, "That Petitioner has now come forward with more detail about purported

---

[2]  Given the constitutional requirement of "attribution" and "constructive knowledge,"
*Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936 (1999) query whether this current Attorney
General's office should also be held to have knowledge of this state of affairs.

improprieties is of no moment" PageID.2459-2460. These statements overlook the deliberate concealment perpetrated by the prosecutor's office and the judiciary with regard to snitch testimony. There is no way Petitioner should be faulted for not discovering what the Attorney General's clients took pains to conceal.

We obtained Edward Allen's Affidavit on January 26, 2013, we obtained Robert Agacinski's Affidavit on May 15, 2013, and filed a Motion for Relief from Judgment in the circuit court on June 5, 2013. This is well within the 1-year time period of § 2244(d)(1)(D) for filing a claim based on newly discovered evidence and surely shows due diligence. Candidly, we do not recall the exact date we came into possession of the Agacinski / Baughman memos, or the Twilley transcripts, but it was between January 2013 (Allen's Affidavit) and May 2013 (Agacinski's Affidavit), soon before we filed our June 5, 2013 Motion for Relief from Judgment.

We cited *Banks v. Dretke*, 540 U.S. 668, 124 S. Ct. 1256, 157 L.Ed. 2d 1166 (2004). "Nothing in...any other decision of this Court suggests that the State can examine an informant at trial, withholding acknowledgment of his informant status in the hope that defendant will not catch on, so will make no disclosure motion." It is clearly established Supreme Court precedent that the Constitution forbids the prosecution and judiciary from "hiding" while requiring the defense to "seek."

> "The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence," Tr. of Oral Arg. 35, so long as the "potential existence" of a prosecutorial misconduct claim might have been detected, id., at 36. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.

*Banks v Dretke*, 540 US 668, 124 S.Ct. 1256157 L.Ed.2d 1166.

The responsibilities of prosecutors have been explicitly set out in multiple Supreme Court cases. Knowing use of false testimony violates due process. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This rule applies regardless of whether the false testimony is solicited, or merely allowed to stand uncorrected after it appears. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Non-disclosure of evidence affecting credibility also falls within this rule "when the 'reliability of a given witness may well be determinative of guilt or innocence.' " *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (quoting *Napue).* As with an alleged *Brady* violation, a finding of materiality is required to show that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury" in order for a petitioner to receive habeas relief. Id.; see *Napue*, 360 U.S. at 271. Courts have similarly concluded that petitioners may receive habeas relief based on the use of false testimony when a petitioner shows that government officers knew about the falsities in the testimony at the time of the trial; and, when there is evidence, such as a credible recantation, indicating that the testimony was in fact false. *Stockton v. Virginia*, 852 F.2d 740, 749 (4th Cir.1988).


Respondent then says we have not been "diligent" in pursuing our rights. PageID.2461-2462. and thus are not entitled to claim equitable tolling. We disagree. All of our filings have been timely, even though our appellate claims were not filed the very next day after the lower courts denied relief! "Due diligence" means "reasonable diligence," not the "maximum feasible diligence." *Wims v. U.S.*

225 F.3d 186 (C.A.2, 2000); *DiCenzi v. Rose,* 452 F.3d 465, 470 (6th Cir.2006). And, it should be construed so as to take into account a prisoner's limitations given the practical realities of confinement in the prison system. *Aron v United States*, 291 F3d 708 (11th Cir 2002).

And, of course, fraudulent concealment or fraud on the court will estop Respondent from claiming that our claims are not "timely" or that we are not entitled to "equitable tolling." See, *Bogan v Huffman*, 238 F. 3d 419 (6th Cir. 2000); *Holland v. Florida,* 560 U.S. 631, ——, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010)(acknowledging equitable tolling). We submit that the concealment of Allen's status as an informant is an "extraordinary circumstance." *Pace v DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).


Respondent says we are have not made a colorable showing of "actual innocence" to qualify for the "gateway" of *Schlup v Delo*, 513 U.S. 298,115 S.Ct. 851 (1995). We incorporate our discussion of "actual innocence" made at pages 25-30 of our Brief in Support of Amended Petition for Habeas Corpus. PageID.166-171 . In addition to the lengthy discussion contained there, what our new evidence shows is that Edward Allen was solicited by Detective Monica Childs to testify falsely at Petitioner's trial. Although the Respondent finds non-credible allegations concerning informant - police collusion and the particular allegations of sexual misconduct between Childs and Allen, apparently Prosecutors Agacinski and Baughman found similar allegations of collusion [3] to be very credible, and these two latter gentlemen were, of course, on the front lines in dealing with

---

[3] We agree that Agacinski and Baughman were not discussing allegations of sexual misconduct between police informants and police in their memos.

the Detroit Police in 1994-1995.  Who better would know whether these allegations were credible

or not than the Wayne County Prosecutor's Office?  And, of course, there is the Twilley transcript,

**proving** that similar arrangements were deliberately concealed with the assistance of certain judges.


Respondent then says we have not established that Allen's trial testimony was false or that

the prosecution "knowingly" presented false testimony.  PageID. 2473-2474. This is incorrect.  First,

we have Allen's signed Affidavit, explicitly renouncing his trial testimony.  PageID. 2416-2423.

Second, this newly discovered evidence, along with the newly discovered evidence contained in his

2003-2004 letters to Petitioner makes clear that (1) Allen had **personal enmity** with Petitioner,

although he claimed to have known Petitioner only since March or April from the jail (Tr II, 103,

PageID.607 )  (2) his claims of "no deals" was false (3) his claims to be a religious Muslim (Tr II,

123-124, 127, PageID.627-628, 631 ) (thus enhancing his credibility, as when the prosecutor in

closing argument called him "Reverend Allen") were false [4] (4) he knew Monica Childs only from

her participation in a charitable program (Tr II, 103-104, 118-119, Page.ID 607-608, 622-623) (5)

his motivation to testify against Petitioner was due to Petitioner's disrespect for women (Tr II, 105-

106, PageID.609-610) (6) he got information about the case only from Petitioner and J. Clay (as

opposed to Monica Childs)(Tr II, 114-116, PageID.618-620) (7) that he never offered to testify

against anybody else at the jail (Tr II, 118-119, PageID.622-623) (8) that the only "beef" he had with

---

[4] See 9-15-2004 letter from Allen to Smith, PageID.1325-1327,
   "Man you on some high tech islamic holy bullshit.  Niggas always
   running to a Bible or a holy [???] or a Koran.  I study law books
   and ... that religion shit is bad luck flat out..."

Petitioner concerned some insult to Allen's masculinity (Tr II, 128, PageID.632).

We have never claimed that prosecutor Donaldson himself knew that Allen testified falsely. But it is immaterial, because he, as the representative of the State, was chargeable with knowledge of Allen's prior activities as a police informant. *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936 (1999). Agacinski and Baughman were certainly on notice that their own prosecutors might be acting as unknowing patsies for the police, which is what Allen's allegations establish – that the police colluded with prisoner informants to present false testimony. When measured by the controlling standards articulated by the Supreme Court to explicate the special duties and responsibilities (1) of a prosecutor to see that justice is done and to guard against due process violations caused by false testimony, and (2) of law enforcement to collect potentially exonerating evidence, the assistant Wayne County Prosecutor's conduct when confronted with the evidence clearly indicating that Allen was a professor jailhouse snitch and may very well be fabricating a case against Petitioner fails on all counts. The ominous signs would alert anyone – and certainly an assistant prosecutor with the Criminal Division – to the strong possibility that Allen had agreed with police to testify falsely against Smith in order to make his situation more favorable.

Faced with this information, the prosecutor's clear duty was to do exactly the opposite of what he did. The law in place when Allen became involved in the case, made his statement, and testified at trial left no room for doubt that the immediate constitutional obligation of the State and its representatives to collect potentially exculpatory evidence, prevent fraud upon the court, and to elicit the truth was to promptly investigate Allen's statements, his criminal background, his

relationship with police officers as a professional informant, the other conflicting evidence, and to interrogate Allen about these matters. The prosecutor's duty to protect the criminal justice system was not discharged in this case simply by ignoring the suspicious evidence about Allen, and by claiming that the prosecutor's office has no way of knowing when a witness is lying. A prosecutor's "responsibility and duty to correct what he knows to be false and elicit the truth," *Napue*, 360 US at 260-70, requires a prosecutor to act when put on notice of the real possibility of false testimony. This duty was not discharged in this case by the prosecutor attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it.       In this case, while it is clear the prosecution knew (or should have known) Allen had perjured himself, the prosecutor proceeded to trial without conducting an investigation to ensure that a new trial is not warranted. This involves "a corruption of the truth-seeking function of the trial process. *United States v. Agurs*, 427 US 97, 103 (1976). The duty to investigate flows from the "constitutional obligation of the State and its representatives to collect potentially exculpatory evidence, to prevent fraud upon the court, and elicit the truth."


With respect to whether our claims of sexual favors between Childs and Allen are only recently made –supposedly "fabricated" by Allen years later – please look at Docket No. 15 in this case, Edward Allen's 9-15-2002 letter to Larry Smith, PageID.1325-1327:

> "What's up?  I'm one of the guys that wrote the UCLA about Detroit Homocide giving Joe Twilley and 7 other guys police reports and making up false statements. The got to over turn over 100 M1 cases, newly discovered evidence.  Homicide had guys put next door to guys on the 9th floor to get infor after they show them photos

of the defendants... Man, you was fucked up when I stepped up in that court room that was a classic. You look guilty fool. You fucked up when you told jack you was going to fuck me up for speaking on your case, I said fuck that crash dummy ass nigga I was at that ass nigga 13 to 29 flat out that was personal. Now its business $200 your punk ass homeboys paid a bitch to set me up. Now let's play CHESS player, he who have been an enemy cannot be a friend. Butter [5] I'm into cutt throat politics nigga get $200 and you tight. ***Monica Childs got some million dollar pussy nigga***. She laxe [likes?] me..."

And attachment 8, 8-4-2004 letter of Edward Allen to Larry Smith, PageID. 1328-1330.

"What's up? ...I beat my case in 1994 on politics. When I got Monica Childs to writ me out of the W.C.J. I was about pussy, paper $ and freedom. I was set up on my case. I showed Ottis W.C. Pepper how to beat the case for your crappy work Worm.[6] ***When I found we was enemys, I put down 13 to 29 CHESS MATE it was personal.***"

We submit that there is no other way to read Allen's letters than as a full confession that he lied at Larry Smith's trial.

Furthermore, Respondent is incorrect in asserting that we have not shown prejudice, i.e. that the newly discovered evidence would not have put the whole case in a different light. PageID.2470. The new evidence completely eviscerates both Allen's and Childs' testimony of a "confession." What we are left with is the one so-called eyewitness, Ralph Cartwright, the repeater of hearsay (Sandra Cartwright), Detective Henahan and circumstantial evidence. Ralph Cartwright's "eye witness" testimony was seriously impeached; contrary to Respondent's assertion, Petitioner was ***not***

---

[5] Petitioner's nickname.

[6] A nickname for Jay Clay.

"seen lying in wait" for Kenneth Hayes. Ursula Jackson denied seeing the shooter (thus, her hearsay statement was admitted as an excited utterance). Cartwright's testimony had been seriously impeached on cross-examination. Although on direct exam he seemed to confidently identify "Butter" as the shooter, his story changed dramatically on cross-examination. He never saw the shooter, and made an identification only on the basis of the shooter's "walk." On cross-examination, he also revealed that he viewed the shooting while looking out the windows that were covered by some sort of curtains, with perhaps only a crack in between the two curtain panels. And, he viewed the shooter as he was running past the window, down the street, firing at the fleeing Ken Hayes. He saw the man chase Ken to the alley, but did not see him run up the alley. (Tr II, 9-11). Rather, the alley was where he last saw him; he didn't actually see the shooter run to the alley. (Tr II, 11). Then, he further backtracked his testimony about Jay Clay – he said he never actually saw Jay Clay driving the car, but saw 2 people in the car. (Tr II, 14). He never saw Petitioner's face at all that morning. (Tr II, 16).

We believe that the bullet casing and the empty box was planted, and it would not be surprising to find a boot print matching Petitioner's boots in his own neighborhood. Allen's allegations, if believed, eviscerate Childs' testimony that Petitioner essentially confessed to her. All that remains is Henahan's testimony that Petitioner said to let J. Clay go. David Pauch said that the slug recovered from Ken Hayes' body could not have been fired from a .40 caliber weapon. (Tr II, 93, 99).

Respondent then says that the allegations concerning Childs and Allen are "incredible."

PageID. 2472. Hardly.  The fact of police-inmate sexual activity is a matter of common occurrence; we attached some random Google links to similar stories in our motion for relief from judgment. There was the matter of the large-scale class action settlement with women inmates of the Michigan Department of Corrections claiming sexual harassment by the guards.  Rather than being not credible, such a claim is highly credible, and in fact, is highly likely.   Allen himself, in his 2002 letters, specifically refers to Monica Childs having "million dollar

p----," an explicit admission that he was involved with her sexually.

Respondent then says we would have had no "right"  to discovery of the Baughman / Agacinski / Twilley materials, thus, no constitutional violation.  PageID. 2467-2469. And, that we have shown "no connection" to this case PageID. 2469. That is untrue.  We have shown that the use of prisoner snitches was a common occurrence contemporaneous to the proceedings in Petitioner's case and that it was not only undisclosed to Petitioner's counsel, but it was affirmatively denied by the prosecution in its closing argument.  Allen's letters cannot be read other than as an admission that he was a professional informant stationed in the jail with familiarity with how the police recruited and handled informants.

Finally, Respondent says we are not entitled to an evidentiary hearing.  We rely on our earlier submission to support our claim to an evidentiary hearing.

Date: February 22, 2016                          /s/ Mary A. Owens_____
                                                  Mary A. Owens P-33896
                                                  124 E. Fulton, Ste. 100
                                                  Grand Rapids, Michigan 49503
                                                  (616) 742-0431

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2016 I electronically filed the following papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

> Hon.  Bernard Friedman
> Raina Korbakis, Assistant Attorney General

Re:   **PETITIONER'S REPLY TO ANSWER**

and I hereby certify that I have mailed by first class mail the same papers to the following non-ECF participant:

> Hon.  Bernard Friedman

Date:   February 22, 2016

/s/__Mary A. Owens_____
Mary A.  Owens P-33896
124 E.  Fulton, Ste.  100
Grand Rapids, Michigan 49503
616-742-0431
maryowens515@gmail.com